_____
                                        )
**A. J. PROPERTIES, LLC,**              )
                                        )
       **Plaintiff,**                   )
                                        )        **Civil Action No.**
       **v.**                           )        **11-10835-FDS**
                                        )
**STANLEY BLACK & DECKER, INC.,**       )
                                        )
       **Defendant.**                   )
_____)


## MEMORANDUM AND ORDER ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

**SAYLOR, J.**

        This dispute concerns an $800,000 performance bond issued for the environmental

remediation of a contaminated parcel of land in Worcester, Massachusetts.  Plaintiff A.J.

Properties, LLC alleges that defendant Stanley Black & Decker, Inc. wrongfully collected

payment under the bond after it had assigned its rights to those proceeds to a third party, the

Wyman-Gordon Company.  As the assignee of Wyman-Gordon with respect to various

agreements relating to the remediation of the property, A.J. Properties contends that it is entitled

to the proceeds of the performance bond.

        In 2010, Stanley settled a claim against the surety on the bond, United Capitol Insurance

Company, which had since been liquidated, and received a payment of $659,000.  A.J. Properties

then commenced this action, in which it alleges breach of contract, conversion, violation of

Mass. Gen. Laws ch. 93A, and unjust enrichment.  It seeks recovery of the money that Stanley

received from United Capitol and a declaration of the rights of the parties.  Jurisdiction is based

on diversity of citizenship.

Plaintiff has moved for partial summary judgment on the issue of its rights to the proceeds of the performance bond, on its contract claims, and on its conversion claim. Defendant has cross-moved for summary judgment in its favor as to all claims asserted against it.

For the reasons set forth below, the Court finds that undisputed facts establish that A.J. Properties was assigned Stanley's interest in the proceeds of the performance bond, but that summary judgment is not warranted as to the conversion claim. In addition, summary judgment will be granted to defendant as to the contract claims, but denied as to the remaining claims.

## I.    Background

During the early and mid-1990s, Stanley-Bostitch, Inc., a predecessor to defendant Stanley Black & Decker, Inc., a Connecticut corporation (collectively, "Stanley"), operated a small-tools manufacturing facility on a site located at 149 Washington Street in Worcester ("the 149 property"). (J.A. at 146, 215).[1]

In March 1995, Stanley became aware of substantial levels of soil and groundwater contamination on portions of the 149 property. (*Id.* at 215). The area surrounding the 149 property had a long history of industrial use, and it is not clear from the record exactly what portion of the contamination was attributable to Stanley. (*Id.* at 145, 515, 843). Nonetheless, it appears that at least some of the degradation resulted from Stanley's manufacturing operations. (*Id.*). In any event, the company submitted a release notice to the Massachusetts Department of Environmental Protection, as required by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E. (*Id.* at 878). Environmental assessments undertaken around that time indicated that the contamination on the 149 property

---

[1] The 149 property itself comprised several separate parcels, which are described in the documents relevant to this dispute. (*Id.* at 27-40).

extended to an adjacent parcel at 105 Madison Street, where the Wyman-Gordon Company operated an industrial facility. (*Id.* at 145-47).

Stanley ceased operations at the 149 property in July 1996. (*Id.* at 147). In October 1997, Vargo & Associates Environmental Consulting Corporation ("Vargo Corp.") completed a "Phase III Remedial Action Plan" for the site that included a risk analysis and evaluation of remedial alternatives. (*Id.* at 141-44). Vargo Corp. and its president, Patrick Vargo, were in the business of evaluating, purchasing, and remediating contaminated properties. (*Id.* at 7).

On December 31, 1997, Stanley and Vargo Corp. entered into an agreement by which Vargo Corp. would purchase the 149 property for one dollar. (*Id.* at 1). Stanley also agreed to pay $400,000 in exchange for Vargo Corp.'s promise to remediate both the 149 property and the Wyman-Gordon property. (*Id.* at 2-4).[2] The agreement provided that as conditions for the closing of the sale, Vargo Corp. would (1) deliver an indemnity agreement executed by it and its principal, Patrick Vargo; (2) obtain a performance bond in the amount of $800,000; and (3) grant Stanley a mortgage on the 149 property that would "secure all obligations of [Vargo Corp.] and Vargo to [Stanley] under the Indemnity Agreement, this Agreement and all other agreements between [Stanley] and [Vargo Corp.]" (*Id.* at 8).

Also on December 31, 1997, the parties executed an Environmental Compliance and Indemnity Agreement to satisfy the first condition of closing under the Purchase and Sale Agreement. (*Id.* at 82-106). In that document, Patrick Vargo and Vargo Corp. agreed to "take all action necessary to obtain all permits, approvals, licenses and the like . . . to fully remediate the Site." (*Id.* at 84). In addition, they promised "to protect, indemnify, reimburse, defend and

---

[2] Under Massachusetts law, Stanley faced continuing liability as a former owner. Mass. Gen. Laws ch. 21E, § 5(a).

hold harmless Stanley . . . from and against any and all liabilities" arising from any breach by Vargo Corp. of the agreements between the parties, from any contamination on the site, or from any activities of Vargo Corp. on the site. (*Id.* at 87).

A Mortgage and Security Agreement was also executed on the same day. (*Id.* at 107). Pursuant to that agreement, Vargo Corp. granted Stanley a mortgage on the 149 property as security for Vargo Corp.'s remediation obligations under the Purchase and Sale Agreement and the Environmental Compliance and Indemnity Agreement. (*Id.*).

On January 22, 1998, Vargo Corp. obtained a performance bond in the amount of $800,000 to fulfill the final condition for closing on the sale. (*Id.* at 69-70). The surety on the bond was the United Capitol Insurance Company. (*Id.*).

Around August 2000, Vargo Corp. suspended operation of the remedial system at the site and, in early 2001, abandoned the site. (*Id.* at 311, 879). Soon thereafter, Wyman-Gordon became aware that the system had not effectively addressed the contamination at the site. (*Id.* at 214-16, 248). On March 16, 2001, it issued a letter to both Stanley and Vargo Corp. in which it asserted that the companies were liable under Mass. Gen. Laws ch. 21E for the remaining contamination. (*Id.* at 214-19). Shortly thereafter, Stanley sent a series of letters to Vargo Corp. and its representative, attorney David Li of Posternak, Blankstein & Lund, LLP. (*Id.* at 220-46). It asserted that Vargo Corp. had breached its duties under the Purchase and Sale Agreement and the Environmental Compliance and Indemnity Agreement and demanded that Vargo Corp. complete the remediation of the 149 property and Wyman-Gordon Property. (*Id.*). It also demanded indemnification under those agreements for any liabilities that arose from the remaining contamination. (*Id.*). On January 11, 2002, David Li responded to Stanley and

explained that his firm had been unable to establish contact with Mr. Vargo for some time. (*Id.* at 247). He indicated that Mr. Vargo had filed for personal bankruptcy and provided the name and address of Mr. Vargo's bankruptcy counsel. (*Id.*).

On February 21, 2002, a representative of Stanley telephoned United Capitol to request its performance as surety under the 1998 performance bond. (*Id.* at 918). The representative reached an answering machine with a recorded message stating that United Capitol's office had closed on February 15, 2002, due to the liquidation of the company. (*Id.*). On October 22, 2002, Stanley submitted a proof of claim with United Capitol's receiver demanding payment of the $800,000 due under the bond. (*Id.* at 248-49, 391-92). That claim was eventually settled for $659,000, which was paid to Stanley on December 22, 2010. (*Id.* at 873).

On December 16, 2002, Wyman-Gordon and Stanley entered into a settlement agreement concerning Wyman-Gordon's claims against Stanley under Mass. Gen. Laws ch. 21E. (*Id.* at 655-68). The settlement provided that Wyman-Gordon would retain a specified contractor to remediate the contaminated portions of the Stanley and Wyman-Gordon properties, with Stanley named as a third-party beneficiary of the contract. (*Id.* at 656-67). The remediation project was to have a fixed price of $855,000. (*Id.* at 657). Of that, Stanley agreed to pay $599,000, which it would place in escrow within 30 days of the signing of the agreement. (*Id.*). Finally, the parties agreed that Stanley would, at a future date, assign to Wyman-Gordon the 1997 Mortgage and the obligations it secured.

At some point during this period, creditors of Vargo Corp. foreclosed on the 149 property and plaintiff A.J. Properties, LLC, a Massachusetts limited liability company, purchased a portion of it at the foreclosure sale. (*Id.* at 880). In March 2003, after it reached the settlement

with Stanley but before it had been assigned the mortgage, Wyman-Gordon entered into an option agreement with A.J. Properties with respect to the property. (*Id.* at 679-85). The agreement provided that, at any time at least one year after the agreement, and at A.J. Properties' option, Wyman-Gordon would assign it the 1997 Mortgage on a portion of the 149 property. (*Id.* at 679-85). The agreement further provided that "Wyman-Gordon [would] assign to [A.J. Properties] simultaneously with the assignment of the Mortgage all rights that Wyman-Gordon has to the obligations and debts which the Stanley Mortgage secures." (*Id.* at 680).

On May 21, 2003, pursuant to the 2002 Settlement Agreement, Stanley assigned the 1997 Mortgage to Wyman-Gordon. (*Id.* at 804). The assignment agreement itself reiterated that it transferred to A.J. Properties both the mortgage and any "claims and obligations secured thereby." (*Id.* at 804).

At an unknown date, a man by the name of Leon Resnick appears to have acquired ownership of a portion of the 149 property. (*Id.* at 874).[3] In 2005, Resnick filed an action in Worcester Superior Court against Wyman-Gordon, A.J. Properties, and several other defendants, seeking to resolve certain property rights and environmental liabilities related to the property. (*Id.* at 877).

On December 4, 2007, A.J. Properties exercised its option to acquire the 1997 mortgage from Wyman-Gordon. (*Id.* at 807). The companies executed an assignment granting to A.J. Properties the mortgage "and the claims secured thereby." (*Id.*).[4]

---

[3] Exactly how Resnick became involved with the property is not clear from the record.

[4] The assignment agreement specified that it "only include[d] Parcel 13, Parcel 14, Parcel 15, Parcel 16, Parcel 17, Parcel 18, Parcel 20 and Parcel 21 described in the Mortgage"—a portion of the 149 property that is now leased by a Burger King restaurant. (*Id.* at 807, 811-15, 905-09).

Soon after acquiring the mortgage, on December 18, 2007, A.J. Properties made a demand on Vargo Corp. and Resnick for payments under the 1997 Environmental Compliance and Indemnity Agreement and the 1997 Mortgage. (*Id.* at 894). It subsequently filed a counterclaim against them in the 2005 action seeking to enforce its rights to indemnification under the agreements. (*Id.* at 890, 895). On November 3, 2011, after the parties to that lawsuit had settled as to all other claims, the Superior Court ruled in favor of A.J. Properties as to its claim for indemnification. (*Id.* at 888). The court assessed damages against Vargo Corp. in the amount of $1,195,057.27, plus interest. (*Id.*).

A.J. Properties commenced this lawsuit in Worcester Superior Court on April 27, 2011. The complaint alleges that Stanley wrongfully obtained payment from United Capitol based on claims under the 1998 performance bond that had been assigned to A.J. Properties. It asserts counts for conversion (Count 1), unjust enrichment (Count 2), money had and received (Count 3), constructive trust (Count 4), breach of contract (Count 5), breach of the covenant of good faith and fair dealing (Count 6), and violation of Mass. Gen. Laws ch. 93A, § 11 (Count 7). A.J. Properties seeks a declaration of the rights of the parties and damages in the amount paid by United Capitol to Stanley to settle Stanley's claim under the bond ($659,000), with interest, fees, and costs. Stanley removed the case to this Court on May 5, 2011.

In its motion for summary judgment, A.J. Properties seeks a ruling that it is entitled by assignment to the proceeds of the 1998 performance bond and that Stanley unlawfully converted those assets by receiving payment on the bond from United Capitol. Stanley has cross-moved for summary judgment in its favor as to all of the claims asserted against it.

## II.    <u>Standard of Review</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*.  Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted).

# III.    Analysis

## A.    Conversion (Count 1)

Count 1 alleges that defendant converted plaintiff's property by collecting on the performance bond in 2010, after the bond had been assigned to plaintiff.

### 1.    Rights of the Parties to the Proceeds of the Performance Bond

A threshold issue with respect to plaintiff's conversion claim is whether the series of assignments of rights and obligations relating to the 149 property included the performance bond. That question requires interpretation of the 2002 Settlement Agreement and the 2003 Assignment, by which defendant assigned rights to Wyman-Gordon, and of the 2003 Option Agreement and 2007 Assignment, by which Wyman-Gordon transferred its rights to plaintiff.

Assignments are interpreted according to ordinary rules of contract interpretation. *Larabee v. Potvin Lumber Co.*, 390 Mass. 636, 641 (1983). Contract interpretation is a question of law for the court, except to the extent that it depends on facts that are disputed. *Robert Indus., Inc. v. Spence*, 362 Mass. 751, 755 (1973). The court's task is guided by "the meaning of the terms of the writing in the light of the circumstances." *Id.* It must seek "to give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible. *Shea v. Baystate Gas Co.*, 383 Mass. 218, 224-25 (1981).

The assignment instruments themselves indicate the categories of obligations and rights that defendant transferred to Wyman-Gordon and that Wyman-Gordon later transferred to plaintiff. First, the 2002 Settlement Agreement between Stanley and Wyman-Gordon provided, in paragraph 7, that:

> Stanley shall assign all rights and interests it has in the [1997 Mortgage] (together
> with any amendments, renewals, extensions or modifications thereto and all

9

claims Stanley may have with respect to the obligations secured by the mortgage)
. . . and the environmental investigation and remediation easement on the Stanley
Property and adjacent properties . . . to Wyman-Gordon or its nominee . . . .

(*Id.* at 660-61) (emphasis added).

The 2003 Wyman-Gordon Assignment, which was executed the following May,

consummated the obligations set forth in paragraph 7 of the 2002 agreement.  It provided that

Stanley thereby assigned "the Assigned Documents, and the claims and obligations secured

thereby, to Wyman-Gordon Company."  (*Id.* at 804).  An exhibit to the agreement defined the

"Assigned Documents" as (1) the 1997 Mortgage, (2) a remediation easement granted to Vargo

pursuant to the 1997 Purchase and Sale Agreement, (3) the 1997 Purchase and Sale Agreement,

(4) the 1997 Environmental Compliance and Indemnity Agreement, and (5) "[a]ll claims for any

and all Obligations (as defined in the Mortgage) of [Vargo Corp.] to [Wyman-Gordon] existing

on the date hereof or arising or incurred hereafter under the [four other assigned documents], *and*

*secured by the Mortgage*.  (*Id.* at 806) (emphasis added).

A rider to the mortgage defines the Obligations encompassed by the fifth category of the

Assigned Documents.  It states:

"Obligations" shall mean all indebtedness, obligations and liabilities of
Mortgagor [Vargo Corp.] to Mortgagee [Stanley] existing on the date hereof or
arising or incurred hereafter under the Purchase Agreement, the Indemnity
Agreement, or other instruments at any time evidencing any thereof or executed
and delivered in conjunction therewith, whether individually or collectively direct
or indirect, joint or several, absolute or contingent, matured or unmatured,
liquidated or unliquidated, secured or unsecured, arising thereunder or hereunder
by contract, operation of law or otherwise.

(*Id.* at 124).

The subsequent transfer of rights from Wyman-Gordon to A.J. Properties was more

straightforward.  The 2003 Option Agreement, which had been executed in March of that year,

had provided that after Wyman-Gordon obtained the rights to the 1997 Mortgage, and at A.J. Properties' option, "Wyman-Gordon [would] assign to [A.J. Properties] simultaneously with the assignment of the Mortgage all rights that Wyman-Gordon has to the obligations and debts which the Stanley Mortgage secures."  (*Id.* at 680).  A.J. Properties exercised its option to receive those rights in 2007.  The resulting Assignment of Mortgage and Security Agreement transferred from Wyman-Gordon to A.J. Properties "the [1997] Mortgage and the claims secured thereby."  (*Id.* at 807-15).

It is thus clear from the assignment documents that by 2007 both the 1997 Mortgage and all claims or obligations secured by it had been assigned to A.J. Properties.  A.J. Properties contends that the right to the proceeds of the performance bond was among those assigned interests because the bond was either (1) part of the property subject to the mortgage, or, in the alternative, (2) among the obligations that were secured by the mortgage and that were assigned to A.J. Properties along with the mortgage itself.

## I.     Property Subject to the Mortgage

The first of those assertions—that the property subject to the mortgage included the proceeds of the performance bond—is controlled by the terms of the 1997 Mortgage and Security Agreement.  That document provides:

> That [Vargo Corp.] IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO [Stanley], with Mortgage Covenants, the Property (as defined in the Mortgage and Security Agreement Rider attached hereto as Schedule I[)] . . . located at and known as 149 Washington Street . . . TOGETHER WITH the rents, issues and profits thereof . . . .

(*Id.* at 107).  The rider attached to the mortgage adopts the definition of "the property" used in Attachment A to the mortgage.  (*Id.* at 124).  That document defines the term as including the

11

premises and all improvements and rents as well as:

> (h) All transferable building service, building maintenance, construction, management, and other similar agreements and contracts . . . arising or in any manner related to the construction, design, improvement, use, operation, occupation, enjoyment, sale, conversion or other disposition . . . of the Premises, . . . including all payment and *performance bonds*, construction guaranties, warranties, contract agreements, [or] technical service agreements . . . ; and

> (I) All proceeds and products of the foregoing of every type.

(*Id.* at 127) (emphasis added). Because the mortgage documents define the property encumbered by the mortgage to include "performance bonds," A.J. Properties contends that the property included the right to payment under the 1998 performance bond.

However, examination of the agreement as a whole demonstrates that "performance bonds," as used in the mortgage, does not encompass the 1998 performance bond. The term occurs in a paragraph that enumerates forms of construction and improvement contracts for the benefit of the property. That context implies that the reference to performance bonds was intended to extend the mortgage's scope to bonds payable to the landowner (or, perhaps, to a lessee or general contractor) for the performance of improvements that benefit the land.

In contrast, the essential purpose of the performance bond was not to benefit the land or its owner. Ostensibly, of course, a performance bond that ensures the remediation of environmental contamination assists the improvement of the degraded land—with clear benefits to the landowner. However, the performance bond was payable to Stanley (the property's *former* owner), not Vargo Corp. (its new owner under the Purchase and Sale Agreement). Thus, the purpose of the bond was not to benefit the land itself, but to shield Stanley from potential liability as a former owner under the Oil and Hazardous Material Release Prevention and Response Act. Indeed, the landowner, Vargo Corp., was a party bound by the performance

bond—not a beneficiary of it. Given that the performance bond did not create any obligations relating to or for the benefit of the land at issue, the Court finds that it is not among the property that was encumbered by the 1997 Mortgage.

### ii.    Assignment of Obligations Secured by the Mortgage

A.J. Properties next contends that the performance bond was among the obligations "secured by" the 1997 Mortgage that it received by means of the 2003 and 2007 assignments.

As noted, the Assigned Documents transferred by the 2003 Wyman-Gordon assignment included all "Obligations"—as defined in the mortgage—that were secured by the mortgage. (J.A. at 806). The rider to the mortgage defined such obligations as including "instruments . . . executed or delivered in conjunction [with the Purchase Agreement or Environmental Compliance and Indemnity Agreement." (*Id.* at 124). The performance bond was among the instruments delivered in conjunction with the Purchase and Indemnity Agreements. Thus, it was among the rights transferred from Stanley to Wyman-Gordon so long as it was secured by the mortgage.

The 1997 Mortgage and Security Agreement defined the obligations it secured as follows:

> (1) Performance of each agreement of [Vargo Corp.] incorporated by reference or contained herein; (2) payment of the Obligations (as defined in the Mortgage Rider); (3) payment of such additional sums as may hereafter be advanced for the account of [Vargo Corp.] or assigns by [Stanley], with interest thereon; and (4) payment and performance by [Vargo Corp.] of each obligation contained in any document, contract and agreement delivered to [Stanley] in conjunction with the sale of the Property to [Vargo Corp.], including without limitation (I) the Agreement of Purchase and Sale of Real Property and Joint Escrow Instructions, and (ii) the Environmental Compliance and Indemnity Agreement . . . .

(*Id.* at 107).

13

A.J. Properties contends that payment under the performance bond was an obligation within the fourth of those categories. Delivery by Vargo Corp. of the performance bond was required in the 1997 Purchase and Sale Agreement, which stated that "as a condition of closing, Buyer shall deliver . . . (iii) a bond . . . ." (*Id.* at 8). Vargo Corp.'s duties under the performance bond were therefore obligations contained in a document that was "delivered to Mortgagee in conjunction with the sale of the Property to Mortgagor" within the meaning of the mortgage security clause.

Defendant contends that the performance bond itself did not create an obligation *of Vargo*, but of United Capitol. However, that document provides:

> [Vargo Corp., as] Principal, . . . and United Capitol Insurance Company, as Surety . . . are held and firmly bound unto [Stanley, as] Obligee . . . in the amount of Eight Hundred Thousand Dollars ($800,000.00), for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.
>
> . . .
>
> [I]f Contractor shall promptly and faithfully perform [the 1997 Environmental Compliance and Indemnity Agreement], then this obligation shall be null and void; otherwise it shall remain in full force and effect.
>
> . . .
>
> Whenever [Vargo Corp.] shall be . . . in default under the [1997 Environmental Compliance and Indemnity Agreement] . . . [United Capitol] may promptly remedy the default, or shall promptly
>
> 1) Complete the Contract in accordance with its terms and conditions, or
>
> 2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, . . . and make available . . . sufficient funds to pay the cost of completion, but not exceeding . . . the amount set forth in the first paragraph hereof.

(*Id.* at 69-70). Because Vargo Corp. ultimately failed to perform the remediation required by the

Environmental Compliance and Indemnity Agreement, the payment obligation under the bond was never nullified. As the text of the bond document clearly states, that obligation was "jointly and severally" held by Vargo Corp. and United Capitol. Thus, the bond obliged Vargo Corp., in addition to its surety, to pay up to $800,000 upon its breach of its remediation duties.

Nor may defendant argue that it retained its rights against United Capitol under the bond notwithstanding its assignment of those rights as against Vargo Corp. As a general matter, "the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment and could have been used or made available to the assignor." *Quaranto v. Silverman*, 345 Mass. 423, 426-27 (1963). Here, United Capitol's joint and several liability under the bond is a remedy incidental to Vargo Corp.'s duty to pay that was available to Stanley before it assigned that obligation; thus, the assignment of Vargo Corp.'s duty carried with it that of its surety. Moreover, it appears that this result was intended by the 2002 Assignment Agreement. That document provided that Stanley would assign "all rights and interests it ha[d] in the [1997 mortgage] (together with any amendments, renewals, extensions or modifications thereto *and all claims Stanley may have [had] with respect to the obligations secured by the mortgage*)." (J.A. at 660-61) (emphasis added). On its face, that statement does not distinguish Stanley's obligations against Vargo Corp. from those against United Capitol.

### 2. Judgment as to Conversion Claim

Having found that A.J. Properties was entitled to the proceeds of the performance bond under the terms of the assignment contracts, the Court turns to plaintiff's conversion claim.

Under Massachusetts law, a defendant may be liable for the tort of conversion if he "intentionally or wrongfully exercised acts of ownership, control or dominion over personal

property to which he has no right of possession at the time . . . ." *In re Brauer*, 452 Mass. 56, 67 (2008) (citations omitted). The First Circuit has articulated the elements of the tort slightly differently, holding that a plaintiff alleging conversion under Massachusetts law must show that:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property[;] (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993).

The undisputed facts in the record establish that Stanley, by receiving payment under the performance bond, came to possess money to which A.J. Properties was entitled. Thus, plaintiff had an ownership interest in the proceeds of the bond at the time defendant received payment under the bond from United Capitol. Even though defendant asserted a good-faith claim of right, the record also shows that plaintiff served it with a letter demanding recovery of the money, which was refused. (J.A. at 874-75). Nonetheless, the Court cannot say on the existing record that Stanley acted with the requisite intent or wrongful purpose to be liable for conversion. The circumstances of its demand for payment from United Capitol and its eventual recovery of a portion of the amount due under the band simply are not sufficiently clear to grant summary judgment on the claim at this time.

Accordingly, summary judgment will be denied as to plaintiff's claim for conversion.

**B.      Equitable Claims (Counts 2, 3, and 4)**

Counts 2-4 allege unjust enrichment, money had and received, and constructive trust. Under Massachusetts law, unjust enrichment requires a plaintiff to prove (1) that it conferred a benefit upon defendant, (2) that defendant accepted the benefit, and (3) that defendant's retention

of the benefit would be inequitable without payment for its value. *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009). Money had and received is essentially the same claim but is limited to enrichment by money or its equivalent. *Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14, 17 n.2 (1st Cir. 2006). Finally, a constructive trust is not a theory of liability but rather an equitable remedy fashioned by courts to right a perceived wrong that results in unjust enrichment. *Maffei v. Roman Catholic Archbishop*, 449 Mass. 235, 246 (2007).

Defendant contends that plaintiff's equitable claims must fail because equitable remedies are not appropriate with respect to claims for which an adequate remedy exists at law. *See Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005). Here, however, the adequacy of plaintiff's remedy at law—namely, its conversion claim—cannot be determined on the existing record. Accordingly, summary judgment will be denied as to the equitable claims.

**C.    Breach of Contract (Count 5)**

Count 5 alleges that by collecting on the performance bond, defendant also breached the assignment agreements to which it was a party.

In order to prove breach of contract, a plaintiff must show "that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted); *see also Loranger Const. Corp. v. E.F. Hauserman, Co.*, 1 Mass. App. Ct. 801, 801 (1973).

The assignment contracts to which Stanley was a party are the 2002 Settlement Agreement and the 2003 Wyman-Gordon Assignment. However, A.J. Properties demonstrates no

breach of those contracts because, as discussed, Stanley *did* assign its rights under the bond. (J.A. at 806). Its subsequent conversion of the proceeds under the bond does not constitute a breach of either of those contracts. Moreover, the contracts at issue were between Stanley and Wyman-Gordon, a third party to this dispute. Neither the 2003 Option Agreement nor the 2007 Assignment transferred to A.J. Properties the right of Wyman-Gordon to enforce its contractual rights against Stanley. (*Id.* at 679-92, 807-15). There is therefore no contract between the parties to enforce.

Accordingly, summary judgment will be granted in favor of defendant as to plaintiff's claim for breach of contract.

### D.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count 6)

Count 6 alleges that, by collecting under the performance bond, Stanley also breached the covenant of good faith and fair dealing with respect to the Wyman-Gordon Assignment.

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991) (quotations omitted). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants*, 441 Mass. at 385.

Plaintiff's claim under the implied covenant fails for the same reason as its contract claim—that is, because A.J. Properties is neither a party to the agreements nor an assignee of the rights they created. Thus, even if Stanley breached the implied covenant of good faith and fair

dealing that bound it as to Wyman-Gordon, A.J. Properties may not enforce that right.

Accordingly, summary judgment will be granted in favor of defendant as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

### E.    Chapter 93A (Count 7)

Count 7 alleges that by collecting proceeds under the performance bond, defendant violated Mass. Gen. Laws ch. 93A.  Plaintiff does not seek a judgment as to its Chapter 93A claim at this time, but defendant does seek a ruling in its favor.

Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  To trigger liability under Chapter 93A, the conduct in question must fall within "'the penumbra of some common-law, statutory, or other established concept of unfairness' or [be] 'immoral, unethical, oppressive or unscrupulous.'"  *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) (quoting *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996).

Defendant contends that plaintiff's claim is derivative of its claim for breach of the covenant of good faith and fair dealing.  Where a Chapter 93A claim is derivative of a contract claim, it cannot be sustained unless a contract in fact exists between the parties.  *See Park Drive Towing, Inc. v. City of Revere*, 442 Mass. 80, 85-86 (2004).  However, it is not clear that the alleged violation of Chapter 93A is derived solely from plaintiff's contract claims, because, for example, plaintiff also alleges conduct of a tortious nature.  Accordingly, the Court will not dismiss the claim on that basis, at least at this time.

Perhaps more on point is the rule that under Chapter 93A, §11, the plaintiff and defendant

"must be engaged in a business relationship for a claim to lie." *L.B. Corp. v. Schweitzer-Mauduit Intern. Inc.*, 121 F. Supp. 2d 147, 152 (D. Mass. 2000) (citing *Reisman v. KPMG Peat Marwick LLP*, 965 F. Supp. 165, 175, n.14 (D. Mass. 1997)).  However, because the parties have not briefed the issue, the Court will not dismiss the claim on that basis alone.

Accordingly, defendant's motion for summary judgment will be denied as to the Chapter 93A claim.

### F.    Declaratory Relief (Count 8)

In Count 8 of the complaint, plaintiff requests declaratory relief in the form of a judgment that it is the assignee of the 1997 Mortgage, the Environmental Compliance and Indemnity Agreement, the Purchase and Sale Agreement, and the performance bond, and that defendant must accordingly turn over to it all proceeds that have been or will be paid by United Capitol's receiver pursuant to the bond, with interests, fees, and costs.  (Compl. ¶¶ 105-06).

Fed. R. Civ. P. 57 states that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."  However, "the existence of another adequate remedy may be a factor bearing on the appropriateness of declaratory relief . . . ."  *Western Elec. Co. v. Hammond*, 135 F.2d 283, 287 (1st Cir. 1943) (citation omitted); *cf. Metropolitan Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 62 (1st Cir. 1984) ("Courts have consistently refused to entertain a declaratory judgment action . . . when a tort action could resolve the same factual issues.").[5]

---

[5] The First Circuit has explained:

In deciding whether to exercise the power to grant declaratory judgment . . . courts look to see whether the declaratory judgment will serve the interests of the litigants or the public.  Do considerations of efficiency, fairness and practical convenience for the court and parties warrant the court's granting a declaration of rights?  Will a declaratory judgment help clarify the legal

Here, plaintiff requests a declaration that would go to issues that will necessarily be resolved by judgments as to plaintiff's contract, tort, and Chapter 93A claims. Those claims, once resolved, may render its request for declaratory relief inappropriate. *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (finding a claim for declaratory relief inappropriate where it "seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action."); *Cypress/Spanish Fort I, L.P. v. Prof'l Serv. Indus.*, 814 F. Supp. 2d 698, 710 (N.D. Tex. 2011) (same). However, because neither plaintiff's conversion claim nor its Chapter 93A claim will be resolved by this Memorandum and Order, it is too early to determine the adequacy of those claims or the appropriateness of declaratory relief.

Accordingly, summary judgment will be denied as to plaintiff's request for declaratory relief.

IV.     **Conclusion**

For the foregoing reasons,

1.     Plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part; Court finds that the undisputed facts in the record establish that Stanley, by receiving payment under the performance bond, came to possess money to which A.J. Properties was entitled; however, summary judgment is not appropriate on that record as to plaintiff's conversion claim (Count 1); and

2.     Defendant's motion for summary judgment is GRANTED in part and DENIED in

_____

questions at issue? Will it relieve the uncertainty or insecurity that gave rise to the dispute? Will the action expedite resolution of the underlying dispute?

*Metropolitan*, 729 F.2d at 62 (citations omitted).

part; summary judgment will be granted in favor of defendant as to the contract

claims (Counts 5 and 6), and denied as to the remaining claims.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 5, 2012