**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
A. J. PROPERTIES, LLC,                      )
                                            )
        **Plaintiff,**                      )
                                            )        **Civil Action No.**
        **v.**                              )        **11-10835-FDS**
                                            )
STANLEY BLACK & DECKER, INC.,               )
                                            )
        **Defendant.**                      )
_____)


**MEMORANDUM AND ORDER CERTIFYING A QUESTION OF STATE LAW**
**TO THE SUPREME JUDICIAL COURT OF MASSACHUSETTS**

**SAYLOR, J.**

        This is a dispute concerning the proceeds from a performance bond issued for the

environmental remediation of a contaminated parcel of land in Worcester, Massachusetts.

Plaintiff A.J. Properties, LLC alleges that defendant Stanley Black & Decker, Inc. wrongfully

collected payment under the bond after it had assigned its rights to those proceeds to a third

party, the Wyman-Gordon Company, which in turn allegedly assigned them to A.J. Properties.

Jurisdiction is based on diversity of citizenship.  The key issue is whether the right to collect

from the surety to the performance bond was included in the series of assignments just described.

        In 1963, the Supreme Judicial Court held that "the assignment of a debt carries with it

every remedy or security that is incidental to the subject matter of the assignment and could have

been used or made available to the assignor." _Quaranto v. Silverman_, 345 Mass. 423 (1963).

However, the SJC has not had occasion to define the limits of that rule, or any potentially

applicable exceptions to it.  In particular, the court has not addressed a situation, such as the one

presented here, where the documented subject of an assignment was a security interest and the

right to recover on a debt incidental to that interest is in question.

The Court recently granted partial summary judgment for plaintiff A.J. Properties, holding that it was assigned Stanley's interest in the proceeds of the performance bond. The underlying facts are largely undisputed.   The outcome of the remaining legal and equitable claims at issue will most likely be determined by the resolution of a question of state law, for which there is no controlling precedent from the SJC.  It therefore appears prudent to certify the question under the method detailed in Supreme Judicial Court Rule 1:03.  *See In re Hundley*, 603 F.3d 95, 97 (1st Cir. 2010).

The following statement of facts and discussion of the relevant legal precedents furnish the background and context for the question to be certified.[1]

## I.    Background

### A.    Relevant Factual Background

During the early and mid-1990s, Stanley-Bostitch, Inc., a predecessor to defendant Stanley Black & Decker, Inc., a Connecticut corporation (collectively, "Stanley"), operated a small-tools manufacturing facility on a site located at 149 Washington Street in Worcester ("the 149 property").  (J.A. at 146, 215).[2]

 In March 1995, Stanley became aware of substantial levels of soil and groundwater contamination on portions of the 149 property.  (*Id.* at 215).  The company submitted a release notice to the Massachusetts Department of Environmental Protection, as required by the

---

[1] All citations to the record included herein refer to page numbers given to the documents as part of the parties' "Joint Appendix of Exhibits" (denoted "J.A."), which was filed with their cross-motions for summary judgment.

[2] The 149 property itself comprised several separate parcels, which are described in the documents relevant to this dispute.  (*Id.* at 27-40).

Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E.  (*Id.* at 878).  Environmental assessments undertaken around that time indicated that the contamination on the 149 property extended to an adjacent parcel at 105 Madison Street, where the Wyman-Gordon Company operated an industrial facility.  (*Id.* at 145-47).

On December 31, 1997, Stanley and entered into an agreement with Vargo & Associates Environmental Consulting Corporation ("Vargo Corp.") by which Vargo Corp. would purchase the 149 property for one dollar.  (*Id.* at 1).  Stanley also agreed to pay $400,000 in exchange for Vargo Corp.'s promise to remediate both the 149 property and the Wyman-Gordon property. (*Id.* at 2-4).[3]  The agreement provided that as conditions for the closing of the sale, Vargo Corp. would (1) deliver an indemnity agreement executed by it and its principal, Patrick Vargo; (2) obtain a performance bond in the amount of $800,000; and (3) grant Stanley a mortgage on the 149 property that would "secure all obligations of [Vargo Corp.] and Vargo to [Stanley] under the Indemnity Agreement, this Agreement and all other agreements between [Stanley] and [Vargo Corp.]"  (*Id.* at 8).

Also on December 31, 1997, the parties executed an Environmental Compliance and Indemnity Agreement to satisfy the first condition of closing.  (*Id.* at 82-106).  In that document, Patrick Vargo and Vargo Corp. agreed to "take all action necessary to obtain all permits, approvals, licenses and the like . . . to fully remediate the Site."  (*Id.* at 84).  In addition, they promised "to protect, indemnify, reimburse, defend and hold harmless Stanley . . . from and against any and all liabilities" arising from any breach by Vargo Corp. of the agreements between the parties, from any contamination on the site, or from any activities of Vargo Corp. on

---

[3] Under Massachusetts law, Stanley faced continuing liability as a former owner.  Mass. Gen. Laws ch. 21E, § 5(a).

the site.  (*Id.* at 87).

A Mortgage and Security Agreement was also executed on the same day.  (*Id.* at 107).
Pursuant to that agreement, Vargo Corp. granted Stanley a mortgage on the 149 property as
security for

> (1) Performance of each agreement of [Vargo Corp.] incorporated by reference or
> contained herein; (2) payment of the Obligations (as defined in the Mortgage
> Rider); (3) payment of such additional sums as may hereafter be advanced for the
> account of [Vargo Corp.] or assigns by [Stanley], with interest thereon; and (4)
> payment and performance by [Vargo Corp.] of each obligation contained in any
> document, contract and agreement delivered to [Stanley] in conjunction with the
> sale of the Property to [Vargo Corp.], including without limitation (I) the
> Agreement of Purchase and Sale of Real Property and Joint Escrow Instructions,
> and (ii) the Environmental Compliance and Indemnity Agreement . . . .

(*Id.* at 107).  The rider to the mortgage defined such "Obligations" as including Vargo's
"indebtedness, obligations and liabilities" under "instruments . . . executed or delivered in
conjunction [with the Purchase Agreement or Environmental Compliance and Indemnity
Agreement]."  (*Id.* at 124).

On January 22, 1998, Vargo Corp. obtained a performance bond in the amount of
$800,000 to fulfill the final condition for closing on the sale.  (*Id.* at 69-70).  The surety on the
bond was the United Capitol Insurance Company.  (*Id.*).

Around August 2000, Vargo Corp. suspended operation of the remedial system at the site
and, in early 2001, abandoned the site.  (*Id.* at 311, 879).  Soon thereafter, Wyman-Gordon
became aware that the system had not effectively addressed the contamination at the site.  (*Id.* at
214-16, 248).  On March 16, 2001, it issued a letter to both Stanley and Vargo Corp. in which it
asserted that the companies were liable under Mass. Gen. Laws ch. 21E for the remaining
contamination.  (*Id.* at 214-19).  Shortly thereafter, Stanley sent a series of letters to Vargo Corp.

4

and its representative, attorney David Li.  (*Id.* at 220-46).  On January 11, 2002, Li responded to Stanley and explained that Patrick Vargo had filed for personal bankruptcy.  (*Id.*).

On February 21, 2002, a representative of Stanley telephoned United Capitol to request its performance as surety under the 1998 performance bond.  (*Id.* at 918).  The representative reached an answering machine with a recorded message stating that United Capitol's office had closed on February 15, 2002, due to the liquidation of the company.  (*Id.*).  On October 22, 2002, Stanley submitted a proof of claim with United Capitol's receiver demanding payment of the $800,000 due under the bond.  (*Id.* at 248-49, 391-92).  That claim was eventually settled for $659,000, which was paid to Stanley on December 22, 2010.  (*Id.* at 873).

On December 16, 2002, Wyman-Gordon and Stanley entered into a settlement agreement concerning Wyman-Gordon's claims against Stanley under Mass. Gen. Laws ch. 21E.  (*Id.* at 655-68).  The settlement provided that Wyman-Gordon would retain a specified contractor to remediate the contaminated portions of the Stanley and Wyman-Gordon properties, with Stanley named as a third-party beneficiary of the contract.  (*Id.* at 656-67).  The remediation project was to have a fixed price of $855,000.  (*Id.* at 657).  Of that, Stanley agreed to pay $599,000, which it would place in escrow within 30 days of the signing of the agreement.  (*Id.*).  Finally, the parties agreed that Stanley would, at a future date, assign to Wyman-Gordon the 1997 Mortgage and the obligations it secured.

At some point during this period, creditors of Vargo Corp. foreclosed on the 149 property and plaintiff A.J. Properties, LLC, a Massachusetts limited liability company, purchased a portion of it at the foreclosure sale.  (*Id.* at 880).  In March 2003, after it reached the settlement with Stanley but before it had been assigned the mortgage, Wyman-Gordon entered into an

option agreement with A.J. Properties with respect to the property.  (*Id.* at 679-85).  The agreement provided that, at any time at least one year after the agreement, and at A.J. Properties' option, Wyman-Gordon would assign it the 1997 Mortgage on a portion of the 149 property.  (*Id.* at 679-85).  The agreement further provided that "Wyman-Gordon [would] assign to [A.J. Properties] simultaneously with the assignment of the Mortgage all rights that Wyman-Gordon has to the obligations and debts which the Stanley Mortgage secures."  (*Id.* at 680).

On May 21, 2003, pursuant to the 2002 Settlement Agreement, Stanley assigned the 1997 Mortgage to Wyman-Gordon.  (*Id.* at 804).  The assignment agreement itself reiterated that it transferred to A.J. Properties both the mortgage and any "claims and obligations secured thereby."  (*Id.* at 804).

On December 4, 2007, A.J. Properties exercised its option to acquire the 1997 mortgage from Wyman-Gordon.  (*Id.* at 807).  The companies executed an assignment granting to A.J. Properties the mortgage "and the claims secured thereby."  (*Id.*).[4]

Soon after acquiring the mortgage, on December 18, 2007, A.J. Properties made a demand on Vargo Corp. for payments under the 1997 Environmental Compliance and Indemnity Agreement and the 1997 Mortgage.  (*Id.* at 894).  On November 3, 2011, the Superior Court ruled in favor of A.J. Properties as to its claim for indemnification.  (*Id.* at 888).  The court assessed damages against Vargo Corp. in the amount of $1,195,057.27, plus interest.  (*Id.*).

B.   **Procedural Background**

A.J. Properties commenced this lawsuit in Worcester Superior Court on April 27, 2011.

---

[4] The assignment agreement specified that it "only include[d] Parcel 13, Parcel 14, Parcel 15, Parcel 16, Parcel 17, Parcel 18, Parcel 20 and Parcel 21 described in the Mortgage"—a portion of the 149 property that is now leased by a Burger King restaurant.  (*Id.* at 807, 811-15, 905-09).

The complaint alleges that Stanley wrongfully obtained payment from United Capitol based on claims under the 1998 performance bond that had been assigned to A.J. Properties.  It asserts counts for conversion (Count 1), unjust enrichment (Count 2), money had and received (Count 3), constructive trust (Count 4), breach of contract (Count 5), breach of the covenant of good faith and fair dealing (Count 6), and violation of Mass. Gen. Laws ch. 93A, § 11 (Count 7).  A.J. Properties seeks a declaration of the rights of the parties and damages in the amount paid by United Capitol to Stanley to settle Stanley's claim under the bond ($659,000), with interest, fees, and costs.  Stanley removed the case to the United States District Court on May 5, 2011.

On December 23, 2011, the parties filed cross-motions for summary judgment.  On September 5, 2012, the Court granted in part and denied in part both motions.  The Court granted partial summary judgment in favor of A.J. Properties, finding that it was indeed entitled to the proceeds of the performance bond.  However, the Court also found that A.J. Properties was not entitled to summary judgment on its conversion claim.  The Court further granted partial summary judgment in favor of Stanley, dismissing the claims of A.J. Properties for breach of contract and breach of the implied covenant of good faith and fair dealing.  The Court subsequently granted A.J. Properties' motion to amend the complaint, adding a claim for post-summary judgment conversion.

Stanley subsequently moved for the Court to clarify and/or reconsider its memorandum and order on the cross-motions for summary judgment.  Among other things, Stanley contended that the Court misapplied the rule of *Quaranto v. Silverman*, 345 Mass. 423, 426-27 (1963).  The Court granted the motion for clarification to correct a relatively minor error, but denied the motion for reconsideration of the substantive issues.

Stanley then moved for interlocutory review of the Court's summary judgment decision in the United States Circuit Court of Appeals for the First Circuit, pursuant to 28 U.S.C. 1292(b). Upon consideration of that motion, the Court determined that an interlocutory appeal to the First Circuit was not the appropriate vehicle for the determination of the contested issue, which is a matter of Massachusetts state contract law.  Instead, the Court suggested certifying the question to the Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03 and requested briefing from the parties on the content of any such certification order.  After reviewing those briefs, the Court now certifies the question as framed herein.

## II.   <u>Discussion</u>

When a question of Massachusetts law may prove determinative in the case at hand and when it appears that there is no controlling precedent from the Commonwealth's highest court, this Court may certify the question to the Supreme Judicial Court.  *See* Mass. S.J.C. Rule 1:03; *In re Engage, Inc.*, 544 F.3d 50, 52 (1st Cir. 2008).  A federal district court may certify a question to the SJC on its own motion, even if neither party has requested certification.  *See In re Hundley*, 603 F.3d at 98; *Turner v. City of Boston*, — F. Supp. 2d —, 2011 WL 379410, at * 6 (D. Mass. Feb. 7, 2011).  Although the parties have not requested certification here, certification is appropriate under the circumstances because both conditions of Rule 1:03 have clearly been satisfied.  As will be further explained, the state law question will likely be determinative, and there is no clear controlling precedent from the SJC.  Moreover, this case presents a question of state common law that is best left to the judgment of the state courts.  Rather than attempt to forecast how the SJC might resolve the question, the most prudent course, and the path that best promotes federal-state comity, is certification.  *See Globe Newspaper Co. v. Beacon Hill*

*Architectural Comm'n*, 40 F.3d 18, 24 (1st Cir. 1994).

In making its summary judgment determination, the Court was required to interpret the language of a number of written instruments executed by the parties, including a 1997 mortgage, a 2002 settlement agreement, a 2003 assignment, a 2003 option agreement, and a 2007 assignment.  None of those instruments made express reference to the debt at issue (a 1998 performance bond), let alone the security interest for that debt, which is the true subject of this litigation.  The Court interpreted a provision in a mortgage rider to find that the performance bond was indeed among the obligations that were secured by the mortgage.  That interpretation is not in dispute.

What is now in dispute is the Court's determination that the subsequent assignments of the mortgage, which included the obligations secured by it, also included the right to recover against the surety for the performance bond.  The Court reached that determination by applying the rule of law that "the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment and could have been used or made available to the assignor."  *Quaranto*, 345 Mass. at 426-27.  The Court held that here, United Capitol's joint and several liability under the bond is a remedy incidental to the duty of Vargo Corp. to pay that was available to Stanley before it assigned that obligation; thus, the assignment of the duty of Vargo Corp. carried with it that of its surety.

Defendant took issue with the application of that rule of law, because in this instance it was the *debt* (that is, the surety obligations under the performance bond) that was incidental to the assignment, and the *security* (that is, the mortgage) that was the actual subject matter of the assignment.  Defendant contended that because the parties specifically mentioned and focused on

the mortgage, which was a security interest, *Quaranto* is inapplicable.

The Court read *Quaranto*, along with the secondary authority it cites, to stand for the proposition that when a debt is assigned, so too is any security interest collateralizing it, unless that security is specifically reserved in the assignment.  Here, the parties assigned the mortgage, including the performance bond obligations, and defendant did not specifically reserve the right to collect against the surety for that bond, United Capitol.  In such a situation, the assignee obtains the right to collect against the surety if, as here, the primary debtor is insolvent.  The Court also held that the fact that *Quaranto* dealt with a situation where a security interest was not the focus of the assignment did not make the rule it states inapplicable.  The focus of the court in *Quaranto* was not on the type of interest that was the main subject of the assignment, but the rights incidental to that interest.  Here, the mortgage was indeed the focus of the assignment; however, in order to fully protect that interest, the mortgage-holder had a number of incidental interests, including the debt that was part of the performance bond.

Although this matter involves claims that were not decided on summary judgment, particularly equitable claims that hinge on the non-existence of an adequate remedy at law, the central issue in all of them is the interpretation the assignments described above, which is an issue of Massachusetts law.  Consequently, it is critical to the just and proper resolution of this matter that the issue of whether the right to recover under the performance bond was part of the assignment to plaintiff is properly decided under Massachusetts law before proceeding to trial.  Accordingly, the first condition of Rule 1:03 has been satisfied.

Because *Quaranto* appears to be the only Massachusetts case that speaks to the relevant issue as to the interpretation of an assignment of a debt, and the defendant is correct in its

assertion that the facts of this case are not directly analogous and much more complex, there exists no true controlling precedent on the question of state law now before the Court. Accordingly, the Court finds that the second condition of Rule 1:03 has been satisfied.

**III.**   **Order**

It is hereby ORDERED that the following question of state law is certified to the Supreme Judicial Court of Massachusetts, pursuant to Supreme Judicial Court Rule 1:03:

> Does the rule of *Quaranto v. Silverman*, 345 Mass. 423, 426-27 (1963), that "the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment and could have been used or made available to the assignor," extend to a situation where a mortgage and a surety agreement secured an obligation, and both the mortgagor and the surety breached that obligation prior to a written assignment of the mortgage, does the assignee, by operation of law, acquire the right against the surety's receiver for the surety's breach of its obligation?

The Clerk of the Court is directed to forward to the Supreme Judicial Court, under official seal, copies of this Memorandum and Order and the entire record of this case.  This case shall be STAYED pending a response to the certified question from the Supreme Judicial Court.
**So Ordered.**

                                   /s/ F. Dennis Saylor
                                   F. Dennis Saylor IV
                                   United States District Judge

Dated: April 8, 2013