UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| A. J. PROPERTIES, LLC, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>STANLEY BLACK & DECKER, INC., )<br>)<br>    Defendant. )<br>) | Civil Action No.<br>11-10835-FDS |

**MEMORANDUM AND ORDER ON DEFENDANT'S
SECOND MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This dispute concerns the proceeds from a performance bond issued for the environmental remediation of a contaminated parcel of land in Worcester, Massachusetts. Plaintiff A.J. Properties, LLC alleges that defendant Stanley Black & Decker, Inc. wrongfully collected payment under the bond after it had assigned its rights to those proceeds to a third party, the Wyman-Gordon Company, which in turn allegedly assigned them to A.J. Properties. Jurisdiction is based on diversity of citizenship.

The Court granted partial summary judgment for A.J. Properties, holding that it had been assigned Stanley's interest in the proceeds of the performance bond. The key issue on summary judgment was whether the right to collect from the surety to the performance bond was included in the series of assignments. After holding that it was so included, and granting summary judgment for plaintiff on that basis, the Court stayed the case and certified the underlying question of state law to the SJC pursuant to the method detailed in Supreme Judicial Court Rule

1:03.

In the meantime, Stanley discovered a release filed in the Registry of Deeds, signed by A.J. Properties, that it contends moots the present dispute. The Court lifted the stay in order to address the potential effect of the stay. Stanley then amended its answer and filed a second motion for summary judgment on the ground that the release prevents A.J. Properties from bringing any future claims relating to the property against it. A.J. Properties opposed the motion, contending that the release does not bar claims brought as assignee of Wyman-Gordon and that it is in unenforceable for lack of consideration or as against public policy. For the reasons set forth below, defendant's motion will be denied.

## I.     Background

The following facts are presented in the light most favorable to the non-moving party, the plaintiff.

### A.     Factual Background

During the early and mid-1990s, Stanley-Bostitch, Inc., a predecessor to defendant Stanley Black & Decker, Inc., a Connecticut corporation (collectively, "Stanley"), operated a small-tools manufacturing facility on a site located at 149 Washington Street in Worcester ("the 149 property"). (Joint Appendix to Mots. Summ. J. ("J.A.") at 146, 215).[1]

In March 1995, Stanley became aware of substantial levels of soil and groundwater contamination on portions of the 149 property. (J.A. at 215). The area surrounding the 149 property had a long history of industrial use, and it is not clear from the record what portion of the contamination was attributable to Stanley. (J.A. at 145, 515, 843). Nonetheless, it appears

---

[1] The 149 property itself comprised several separate parcels, which are described in the documents relevant to this dispute. (J.A. at 27-40).

that at least some of the degradation resulted from Stanley's manufacturing operations. (*Id.*). In any event, the company submitted a release notice to the Massachusetts Department of Environmental Protection, as required by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E. (J.A. at 878). Environmental assessments undertaken around that time indicated that the contamination on the 149 property extended to an adjacent parcel at 105 Madison Street, where the Wyman-Gordon Company operated an industrial facility. (J.A. at 145-47).

Stanley ceased operations at the 149 property in July 1996. (J.A. at 147). In October 1997, Vargo & Associates Environmental Consulting Corporation ("Vargo Corp.") completed a "Phase III Remedial Action Plan" for the site that included a risk analysis and evaluation of remedial alternatives. (J.A. at 141-44). Vargo Corp. and its president, Patrick Vargo, were in the business of evaluating, purchasing, and remediating contaminated properties. (J.A. at 7).

On December 31, 1997, Stanley and Vargo Corp. entered into an agreement by which Vargo Corp. would purchase the 149 property for one dollar. (J.A. at 1). Stanley also agreed to pay $400,000 in exchange for Vargo Corp.'s promise to remediate both the 149 property and the Wyman-Gordon property. (J.A. at 2-4).[2] The agreement provided that as conditions for the closing of the sale, Vargo Corp. would (1) deliver an indemnity agreement executed by it and its principal, Patrick Vargo; (2) obtain a performance bond in the amount of $800,000; and (3) grant Stanley a mortgage on the 149 property that would "secure all obligations of [Vargo Corp.] and Vargo to [Stanley] under the Indemnity Agreement, this Agreement and all other agreements between [Stanley] and [Vargo Corp.]" (J.A. at 8).

---

[2] Under Massachusetts law, Stanley faced continuing liability as a former owner. Mass. Gen. Laws ch. 21E, § 5(a).

Also on December 31, 1997, the parties executed an Environmental Compliance and Indemnity Agreement to satisfy the first condition of closing under the Purchase and Sale Agreement. (J.A. at 82-106). In that document, Patrick Vargo and Vargo Corp. agreed to "take all action necessary to obtain all permits, approvals, licenses and the like . . . to fully remediate the Site." (J.A. at 84). In addition, they promised "to protect, indemnify, reimburse, defend and hold harmless Stanley . . . from and against any and all liabilities" arising from any breach by Vargo Corp. of the agreements between the parties, from any contamination on the site, or from any activities of Vargo Corp. on the site. (J.A. at 87).

The same day, Vargo Corp. and Stanley also executed a Mortgage and Security Agreement. (J.A. at 107). Pursuant to that agreement, Vargo Corp. granted Stanley a mortgage on the 149 property as security for Vargo Corp.'s remediation obligations under the Purchase and Sale Agreement and the Environmental Compliance and Indemnity Agreement. (*Id.*).

On January 22, 1998, Vargo Corp. obtained a performance bond in the amount of $800,000 to fulfill the final condition for closing on the sale. (J.A. at 69-70). The surety on the bond was the United Capitol Insurance Company. (*Id.*).

Around August 2000, Vargo Corp. suspended operation of the remedial system at the site and, in early 2001, abandoned the site. (J.A. at 311, 879). Soon thereafter, Wyman-Gordon became aware that the system had not effectively addressed the contamination at the site. (J.A. at 214-16, 248). On March 16, 2001, it issued a letter to both Stanley and Vargo Corp. in which it asserted that the companies were liable under Mass. Gen. Laws ch. 21E for the remaining contamination. (J.A. at 214-19). Shortly thereafter, Stanley sent a series of letters to Vargo Corp. and its representative, attorney David Li of Posternak, Blankstein & Lund, LLP. (J.A. at

220-46). It asserted that Vargo Corp. had breached its duties under the Purchase and Sale Agreement and the Environmental Compliance and Indemnity Agreement and demanded that Vargo Corp. complete the remediation of the 149 property and Wyman-Gordon Property. (*Id.*). It also demanded indemnification under those agreements for any liabilities that arose from the remaining contamination. (*Id.*). On January 11, 2002, David Li responded to Stanley and explained that his firm had been unable to establish contact with Mr. Vargo for some time. (J.A. at 247). He indicated that Mr. Vargo had filed for personal bankruptcy and provided the name and address of Mr. Vargo's bankruptcy counsel. (*Id.*)

On February 21, 2002, a representative of Stanley telephoned United Capitol to request its performance as surety under the 1998 performance bond. (J.A. at 918). The representative reached an answering machine with a recorded message stating that United Capitol's office had closed on February 15, 2002, due to the liquidation of the company. (*Id.*). On October 22, 2002, Stanley submitted a proof of claim with United Capitol's receiver demanding payment of the $800,000 due under the bond. (J.A. at 248-29, 391-92). That claim was eventually settled for $659,000, which was paid to Stanley on December 22, 2010. (J.A. at 873).

On December 16, 2002, Wyman-Gordon and Stanley entered into a settlement agreement concerning Wyman-Gordon's claims against Stanley under Mass. Gen. Laws ch 21E. (J.A. at 655-68). The settlement provided that Wyman-Gordon would retain a specified contractor to remediate the contaminated portions of the Stanley and Wyman-Gordon properties, with Stanley named as a third-party beneficiary of the contract. (J.A. 656-67). The remediation project was to have a fixed price of $855,000. (J.A. at 657). Of that, Stanley agreed to pay $599,000, which it would place in escrow within 30 days of the signing of the agreement. (*Id.*). The parties

agreed that Stanley would, at a future date, assign to Wyman-Gordon the 1997 Mortgage and the obligations it secured. (J.A. at 660). Both parties released one another from liability in connection with the property, except claims to enforce the agreement. (J.A. at 661). Finally, they conditioned the agreement, in part, on Wyman-Gordon being the high bidder at a foreclosure sale of a second mortgage Vargo had obtained on the 149 property. (J.A. at 664).

However, at the foreclosure sale, A.J. Properties, not Wyman-Gordon, was the winning bidder. (J.A. at 689). On March 24, 2003, Angelo Vangos, on behalf of A.J. Properties, and Wyman-Gordon entered into an agreement. Wyman-Gordon agreed to assign the Stanley Mortgage encumbering the "Burger King property" at any time at least one year after the agreement and at A.J. Properties' option. (J.A. at 679-85).[3] The agreement further provided that "Wyman-Gordon [would] assign to [A.J. Properties] simultaneously with the assignment of the Mortgage all rights that Wyman-Gordon has to the obligations and debts which the Stanley Mortgage secures." (J.A. at 680).

Meanwhile, Stanley and Wyman-Gordon amended their settlement agreement to allow for this change in circumstances. In part, Stanley gained the right to review and approve any agreement between Wyman-Gordon and the buyer of the Stanley Property. (J.A. at 670-72). In the Fourth Amendment, Stanley explicitly agreed to Wyman-Gordon's assignment of "the Stanley Mortgage, Easement and related documents referred to in paragraph 7 of this Agreement and in Exhibit C hereto to A.J. Properties."[4] (J.A. at 674-75). Pursuant to this Agreement, on

---

[3] The assignment agreement specified that it "only include[d] Parcel 13, Parcel 14, Parcel 15, Parcel 16, Parcel 17, Parcel 18, Parcel 20 and Parcel 21 described in the Mortgage"—a portion of the 149 property that is now leased by a Burger King restaurant (the "Burger King property"). (J.A. at 807, 811-15, 905-09).

[4] Exhibit C is the "Assignment of Mortgage and Related Security Documents" between Stanley and Wyman-Gordon. (*See* J.A. 804-06).

May 21, 2003, Stanley assigned the 1997 Mortgage to Wyman-Gordon. (J.A. at 804). The assignment itself reiterated that it transferred to Wyman-Gordon both the mortgage and any "claims and obligations secured thereby." (*Id.*)

In this same time period, on May 5, 2003, Stanley, Wyman-Gordon, and A.J. Properties signed a release. (Mot. Summ. J., Ex. 1). It provides:

> A.J. Properties, LLC, Angelo Vangos and John Vangos (each, a "Releasor" and together, the "Releasors") . . . hereby release, remise and forever discharge [Stanley and Wyman-Gordon] . . . of and from all present, future and contingent claims, acts, debts, demands, actions, causes of action, suits, dues, sum and sums of money, guarantees, bonds, specialties, covenants, contracts, accounts, reckonings, controversies, agreements, promises, representations, restitutions, doings, omissions, variances, damages, executions and liabilities whatsoever of every name and nature, both in law and in equity . . . whether asserted or unasserted, known or unknown and whether based on negligence, intentional acts, strict liability or any other theory, and which the Releasors may now or hereafter have against [Stanley and Wyman-Gordon] from the beginning of the world specifically arising out of or in connection with . . . 149 Washington Street, Worcester, Massachusetts.

(*Id.*). A.J. Properties specifically did not release Wyman-Gordon from "any of its obligations and responsibilities" under their March 24, 2003 Agreement. (*Id.*). The release was then recorded in the Worcester Registry of Deeds. (*Id.*)

At an unknown date, a man by the name of Leon Resnick appears to have acquired ownership of a portion of the 149 property. (J.A. at 874).[5] In 2005, Resnick filed an action in Worcester Superior Court against Wyman-Gordon, A.J. Properties, and several other defendants, seeking to resolve certain property rights and environmental liabilities related to the property. (J.A. at 877).

On December 4, 2007, A.J. Properties exercised its option to acquire the 1997 Mortgage

---

[5] The record does not make clear how Resnick became involved with the property.

from Wyman-Gordon. (J.A. at 807). The companies executed an assignment granting to A.J. Properties the mortgage "and the claims secured thereby." (*Id.*).

Soon after acquiring the mortgage, on December 18, 2007, A.J. Properties made a demand on Vargo Corp. and Resnick for payments under the 1997 Environmental Compliance and Indemnity Agreement and the 1997 Mortgage. (J.A. at 894). It subsequently filed a counterclaim against them in the 2005 action seeking to enforce its rights to indemnification under the agreements. (J.A. at 890, 895). On November 3, 2011, after the parties to that lawsuit had settled as to all other claims, the Superior Court ruled in favor of A.J. Properties as to its claim for indemnification. (J.A. at 888). The court assessed damages against Vargo Corp. in the amount of $1,195,057.27, plus interest. (*Id.*).

### B. Procedural Background

A.J. Properties filed this lawsuit in Worcester Superior Court on April 27, 2011, alleging that Stanley wrongfully obtained payment from United Capitol based on claims under the 1998 performance bond that had been assigned to A.J. Properties. It asserted counts for conversion, unjust enrichment, money had and received, constructive trust, breach of contract, breach of covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A, § 11. A.J. Properties sought a declaration of the rights of the parties and damages in the amount paid by United Capitol to Stanley to settle Stanley's claim under the bond ($659,000), with interest, fees, and costs. Stanley removed the case to this Court on May 5, 2011.

On December 23, 2011, the parties filed cross-motions for summary judgment. On September 5, 2012, the Court granted in part and denied in part both motions. The Court granted partial summary judgment in favor of A.J. Properties, finding that it was entitled to the proceeds

of the performance bond. However, the Court also found that A.J. Properties was not entitled to summary judgment on the conversion claim. The Court further granted partial summary judgment in favor of Stanley, dismissing the claims of A.J. Properties for breach of contract and breach of the implied covenant of good faith and fair dealing. The Court subsequently granted A.J. Properties' motion to amend the complaint, adding a claim for post-summary judgment conversion.

Stanley then moved for the Court to clarify and/or reconsider its memorandum and order on the cross-motions for summary judgment. Among other things, Stanley contended that the Court misapplied the rule of *Quaranto v. Silverman*, 345 Mass. 423, 426-27 (1963). The Court granted the motion for clarification to correct a relatively minor error, but denied the motion for reconsideration of the substantive issues.

Stanley then moved for interlocutory review of the Court's summary judgment decision to the United States Court of Appeals for the First Circuit pursuant to 28 U.S.C. 1292(b). Upon consideration of that motion, the Court determined that an interlocutory appeal to the First Circuit was not the appropriate vehicle for the determination of the contested issue, which is a matter of Massachusetts state contract law. Instead, the Court suggested certifying the question to the Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03. After briefing from the parties, on April 8, 2013, the Court certified a question to the SJC and stayed the case.

While the case was stayed, Stanley located the May 5, 2003 release, of which neither party (or their counsel, in any event) apparently had known and which this Court, therefore, had not considered. On July 10, 2013, Stanley moved to lift the stay and amend its answer, which the Court granted. Stanley then filed an amended answer on August 7, 2013.

On August 8, 2013, the Court issued a memorandum to the SJC, advising it of the potential change in circumstances, including the fact that it had lifted the stay to consider the possible impact of the newly-discovered release. On September 9, 2013, Stanley filed a second motion for summary judgment in its favor as to all claims.

## II.   Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the Court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

Whether summary judgment is appropriate at this juncture turns on the import of the release. Thus, the first question is whether the release is valid and enforceable.

Releases are a form of contract. *Leblanc v. Friedman*, 438 Mass. 592, 596 (2003); *Sharon v. City of Newton*, 437 Mass. 99, 105 (2002). As a contract, releases are binding on the parties if they are clear in their terms, freely entered into, or not otherwise invalid. *Radovsky v. Wexler*, 273 Mass. 254, 257 (1930).

As a contract, the interpretation of a release is a question of law for the court to determine. *DosSantos v. Dep't of Revenue*, 60 Mass. App. Ct. 1102, at *1 (2003) (citing *Leblanc*, 438 Mass. at 596). Considerations include the intent of the parties, the terms of the agreement, and the surrounding facts and circumstances. *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers*, 411 Mass. 39, 46 (1991). When parties execute multiple documents in the same transaction, they should be read together. *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 135 (1st Cir. 2012).

The parties to a release need not have imagined the specific wrongs released. *Naukeag Inn, Inc. v. Rideout*, 351 Mass. 353, 356 (1966). If the terms of the release apply, then the release should be given effect. *Id.* A party may release another from liability arising not just from past conduct but also as to future or contingent claims. *Radovsky v. Wexler*, 273 Mass. 254, 257-58 (1930). *See Atlas Tack Corp. v. Crosby*, 41 Mass. App. Ct. 429, 432-33 (1996). "An existing obligation or contract right between the parties, although executory and in some respects dependent upon contingencies that might never happen, is one that can be released." *Radovsky*, 273 Mass. at 257 (citing *Pierce v. Parker*, 4 Metc. 80).

However, under Massachusetts law, a release of liability for future harm caused intentionally, recklessly, or with gross negligence is unenforceable as against public policy. *See Gillespie v. Papale*, 541 F. Supp. 1042, 1046 (D. Mass. 1982) (holding release did not exempt

11

liability for gross negligence); *Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 44 Mass. App. Ct. 17, 19 (1997) (same); *see also In re Cunningham*, 365 B.R. 352, 365 (Bankr. D. Mass. 2007); *Massmanian v. DuBose*, 2008 WL 698472 (Mass. Super. Feb. 27, 2008) (Gants, J.) ("[P]ublic policy would not permit someone to release another from intentional tortious conduct that may be committed in the future."); Restatement (Second) of Contracts § 195.

Here, Stanley and A.J. Properties signed a release purporting to discharge Stanley from:

> all present, future and contingent claims . . . whether based on negligence, intentional acts, strict liability or any other theory and which [A.J. Properties] may now or hereafter have against Stanley . . . specifically arising out of or in connection with . . . 149 Washington Street.

(Mot. Summ. J., Ex. 1). Based on the execution of that release, Stanley now seeks to avoid liability for all claims—including any intentional torts (such as conversion)—asserted by A.J. Properties. Unfortunately for Stanley, the alleged intentional tort on which suit has been brought (conversion of the bond proceeds) did not occur until December 2010, when it was paid those proceeds. The release, signed in 2003, cannot release Stanley, as a matter of public policy, for liability for intentional torts occurring in 2010. *See Eck v. Godbout*, 444 Mass. 724, 730-31 (2005).[6]

That the parties could foresee that A.J. Properties would obtain the mortgage and obligations secured by it does not change this analysis. The fact remains that A.J. Properties did not know at the time that Stanley would recover money from United Capitol and did not have a right at the time to pursue any claim for conversion of those funds. The factual basis of that (claimed) intentional tort did not exist when Stanley and A.J. Properties signed the release, and

---

[6] That holding does not entirely vitiate the release. Among other things, the release still prevents A.J. Properties as a general matter from bringing suit against Stanley for claims that had accrued before it was signed.

therefore any such claims were not released.[7]

It is also clear that A.J. Properties has the right to bring the claims as Wyman-Gordon's assignee, because an assignee "stands in the shoes" of its assignor. *Young v. Lepone*, 305 F.3d 1, 17 (1st Cir. 2002). This Court previously held that Stanley assigned the mortgage of the 149 property and all obligations secured thereby, which include the performance bond, to Wyman-Gordon. *A.J. Properties, LLC v. Stanley Black & Decker, Inc.*, 2013 WL 5356891, at *7-*8 (D. Mass. Feb. 4, 2013). In the 2002 Settlement, in which Stanley agreed to transfer the rights to Wyman-Gordon, Wyman-Gordon released Stanley from liability in connection with the 149 property *except* to enforce that settlement agreement. (J.A. 661). If Wyman-Gordon had never assigned the rights to A.J. Properties and Stanley had obtained and retained the performance bond proceeds, then Wyman-Gordon would be able to bring a claim against Stanley. However, Wyman-Gordon did assign the rights, and that assignee, A.J. Properties, has all the rights that Wyman-Gordon had. *See Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 81-82 (1st Cir. 1986). Because A.J. Properties did not release Stanley from liability for future intentional torts, it may now bring any claims for such torts that Wyman-Gordon would have had against Stanley.

The question that remains is whether the release demands a reconsideration of this Court's prior holding that Stanley assigned the right to the performance bond to Wyman-Gordon, which in turn assigned it to A.J. Properties. Stanley contends that the release confirms that A.J. Properties only sought—and therefore only received—the rights to the Burger King property and its concomitant rents. In fact, the release does not mention the Burger King property, as such; it

---

[7] Stanley contends that its conduct is rendered "not tortious" by the release. That misstates the law. A release does not change the fact that a tort occurred; it simply provides the tortfeasor a defense to liability.

addresses the entirety of the 149 property. The terms of the release do not illuminate the question of the parties' intent as to the performance bond. And even if Stanley presents a plausible narrative that A.J. Properties was primarily interested in the Burger King rents, that does not mean that it did not also bargain for and obtain other rights.

In sum, the release does not bar a finding of liability against Stanley for the claims that A.J. Properties now brings. Stanley has not demonstrated that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Accordingly, its motion for summary judgment will be denied.

### IV.     Conclusion

For the foregoing reasons, defendant's motion for summary judgment is DENIED. The Clerk of the Court will be directed by separate order to forward to the Supreme Judicial Court, under official seal, copies of this Memorandum and Order and any other part of the record of this case that was not previously so forwarded.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 22, 2013